## Staunton

### Henry A. Menefee v. Commonwealth of Virginia.

September 7, 1949.

Record No. 3543.

Present, All the Justices.

The opinion states the case.

*C. Carter Lee, Virgil H. Goode, W. L. Joyce* and *T. Keister Greer*, for the plaintiff in error.

*J. Lindsay Almond, Jr., Attorney General,* and *Henry T. Wickham, Assistant Attorney General,* for the Commonwealth.

MILLER, J., delivered the opinion of the court.

On the night of May 24, 1947, about 9:00 o'clock p. m., a robbery was perpetrated by three or more persons at the home of Ernest Gilbert in Pittsylvania county. The crime was committed by force, violence and use of firearms. Ernest Gilbert was shot and killed, and his iron safe, which contained some money, was carried away in a motor vehicle. When located several months later, buried in a dump pile, it had been blown open and the contents removed. Henry

A. Menefee was indicted for the robbery, convicted and sentenced to ten years imprisonment.

At the trial, certain testimony of Ocie Wade Menefee, divorced wife of accused who was called as a witness on behalf of the Commonwealth, was admitted in evidence over his objections. He contends that this evidence consisted of and actually amounted to "communications privately made" by him to her while they were married, and was inadmissible under section 6212 of the Code of Virginia, 1942 (Michie).

Though the three sections, i. e., 6210, 6211 and 6212 of the Code, have to do with the privilege, qualification and competency of husbands and wives as witnesses for or against each other, only the latter section is directly and immediately pertinent to the question presented. It reads:

"Neither husband nor wife shall, without the consent of the other, be examined in any case as to any communication privately made by one to the other while married, nor shall either be permitted, without such consent, to reveal in testimony after the marriage relation ceases any such communication made while the marriage subsisted."

■ This common law rule, rendering inadmissible confidential communications between husband and wife, as now embodied in that statute, is not to be confused with the rule which disqualified a husband or wife, while such, to testify for or against each other. 2 Wigmore on Evidence, 3rd Ed., sec. 600, et seq.; 5 Jones on Evidence, 2nd Ed., secs. 2128 and 2136, and 58 Am. Jur. "Witnesses", secs. 175 and 375. The latter disqualification or disability is now removed by statute except in specified instances. Code, sec. 6210.

The privilege against disclosure of communications privately made,—i. e., confidential communications between husband and wife,—is different in origin, scope, and purpose, and survives termination of the marriage. 8 Wigmore on Evidence, 3rd Ed., secs. 2333 and 2334; 5 Jones on Evidence, 2nd Ed., sec. 2147.

The accused and Ocie Wade Menefee were legally married and living together at their home in Franklin county

on the date of the crime. Some months subsequent to the night of the robbery, these parties separated and she obtained an absolute divorce from him on July 6, or 7, 1948. That was almost five months prior to the date of his trial and conviction.

The testimony given by her and complained of is as follows:

She said that about 3:00 o'clock p. m., on May 24, 1947, accused left their home near Rocky Mount in his automobile and did not return until sometime between 12 and 2:00 o'clock a. m. that night. Upon his arrival, he appeared sober, but somewhat nervous, though being nervous was not unusual for him. Just after entering their home, he placed a pistol on the mantel. On one occasion shortly after this date she observed him in their back yard "messing with the lid" to the trunk of the car with a razor blade. She also testified that she drove accused around the vicinity of Ferrum in Franklin county several times after the robbery. Her testimony to that effect follows:

"Q. Mrs. Menefee, this safe right here was found in the general neighborhood of Ferrum. I think you know where it was. State whether or not you took your husband up in that general vicinity after this robbery?

"A. Yes, I did.

"Q. You drove him in your car?

"A. Yes, sir.

"Q. How many times?

"A. Two or three. I am not sure."

She also identified a pearl-handle pistol which was offered in evidence at the trial as the one she had seen her husband place on the mantel upon his return home on the night of May 24, 1947. It was established by other witnesses that two bullets fired by the robbers during the commission of the crime became embedded in the wall of Ernest Gilbert's home. When removed, they, along with the pearl-handle pistol, were examined by an FBI ballistic expert. His testimony was to the effect that one of the bullets had been fired from that pistol.

Lt. Bingham, a member of the State Police, testified that on March 22, 1948, he located the safe, buried in a junk pile near Ferrum. It appears from the record that he was told of its whereabouts by Ocie Wade Menefee. The question and answer so indicating follows:

"Q. Who told you where the safe was?

"A. Mrs. Menefee told me that it was over in or under a junk pile on the mountain."

Though the above testimony was stricken out and the jury told to disregard the statements made by accused's wife to the officer, its detrimental effect no doubt continued.

It was also established by testimony of another FBI physics and chemical expert that upon thorough microscopic and spectroscopic examination and chemical tests, particles of paint found upon the inside fibre insulation of the automobile trunk lid that Ocie Wade Menefee had seen accused "messing with" were of the same ingredients and composition as the paint on the safe. He concluded and gave as his expert opinion that the paint particles found on the inside of the car trunk lid and the paint particles taken by him from the safe could have and most probably "originated from the same source."

It thus appears that information as to acts and conduct of her husband obtained by the wife during and solely as a result of the marriage relation existing between them and detailed by her at length as a witness constituted damaging circumstantial evidence.

He contends that his conduct, physical acts and appearance, such as returning home between 12 and 2:00 o'clock a. m. on the night of the robbery, placing the pistol on the mantel in his home, appearing sober, but nervous, scraping with a razor blade the inside of the trunk lid of the car standing in the yard of their home, and having his wife drive and accompany him on several trips to Ferrum, all of which information being so imparted to her privately and by reason of the existing marital relation and the confidence that such relation generated and should protect, constituted "communications privately made" and fall under

the ban of the statute. In short, he asserts that the law of evidence and the purpose and intention of this statute, which treat, deal with and preclude the use of confidential communications, *i. e.*, "communications privately made," between husband and wife during coverture extend to and include all knowledge and information, however imparted, *whether by acts, conduct, spoken or written words,* which are prompted from one and become known to the other solely by virtue of the relationship of husband and wife.

The Commonwealth contends (1) that accused failed to comply with Rule ‘22 of this court, which says, "all objections to * * * the admissibility ₒof evidence * * * shall state with reasonable certainty the ground of objection * * * ," and (2) the language used in section 6212 of the Code, "any communication privately made" means and is limited solely to *written or spoken words* between the spouses.

We find as a part of the record a stipulation of counsel which recites the objections made by accused to admission of the testimony, a passage from which reads:

" * * * the question of her testifying having been brought up in the Commonwealth's opening statement and objection having been made, and the question of the admissibility of her evidence was discussed at length; the defendant, by counsel, objecting to her being allowed to testify as to any communication, matter or fact which came to her knowledge concerning Henry A. Menefee, her husband, during marriage, the said Ocie Wade Menefee having secured a divorce from the defendant on July 6, 1948. Objection was made by counsel for defendant as to her testifying as to any matter or fact which came to her knowledge as the result of being the wife of the said defendant, during marriage, as to any communication between them, and that the communications were not limited to mere verbal acts, and further that she could not testify as to anything that occurred during the time that she was married. * * * "

The following language appears in the opinion of the trial

judge, which opinion is expressly included as a part of the record:

"The wife had been granted an absolute divorce from the accused and her testimony did not concern 'Privileged Communications' as the term has been defined; she was not permitted to testify as to *any conversation had with her husband concerning the robbery*, but she was permitted to testify as to what she saw and to *facts that she knew of her own knowledge;* all of which came to her knowledge while the marriage subsisted and the *facts testified to by the wife were undoubtedly gained by virtue of the fact that the parties were, at the time, living together as man and wife.* (Emphasis added.)

"Counsel for the accused contend that the divorced wife is not a competent witness regarding matters learned by her against him while the marriage relationship existed and that this disqualification survives the termination of the relationship by death or as in this case, by absolute divorce."

Express reference is also made therein to section 6212. One pertinent sentence of the opinion reads: "Section 6212, which is particularly here involved, saves confidential communications from disclosure after the relationship has ceased."

We conclude that it sufficiently appears from the above stipulation and opinion that the ground of objection now relied upon to the admissibility of the questioned testimony was stated with reasonable certainty when made in the trial court, and Rule 22 was complied with.

Prior to the effective date of the Revised Code of 1919, the wording of section 6212 was somewhat different from what it now is. Acts 1901-02, p. 798; Pollard's Code (1904), 3346-a, cl. (3). The word "privately" did not appear therein immediately following the word "communication."

Conflict of opinion as to whether its prohibition applied only to confidential communications or included those made in the presence of another appears in the decisions of *Wilkes* v. *Wilkes*, 115 Va. 886, 80 S. E. 745, and *Pilcher* v. *Pilcher*, 117 Va. 356, 84 S. E. 667, L. R. A. 1915D, 902, both of

which cases were decided before the effective date of the Code of 1919. See 1 Va. L. R., N. S., p. 44.

In the *Wilkes Case, supra,* it is said: "The language of the statute is as broad and comprehensive as could have been used to express the intent of the framers thereof. It is founded on public policy and applies to 'any communication' between husband and wife, no matter what its nature, whether confidential or not, its language being that neither husband nor wife shall, without the consent of the other, be examined *in any case* as to *any communication* made by the one to the other. * * * " (115 Va. 892.)

While in *Pilcher* v. *Pilcher, supra,* at page 368, we find this: "The communications to the admission of which exception was taken were made in the presence of a third person, and in no just sense were either confidential or privileged."

We need not now, however, concern ourselves with whether the statute, as it read prior to its revision, was limited to confidential communications or not. Through the addition of the word "privately" by the Code Revisors so that the pertinent phrase now reads "any communication privately made", it is evident that only communications of a confidential nature now fall within its terms. That is settled by the decision of *Thomas* v. *First Nat. Bank,* 166 Va. 497, 186 S. E. 77. After reciting the definitions of the word "private" as given in Webster's New International Dictionary, 2nd Ed., the court said:

"Considering the meaning of the language in the statute in the light of the above definitions, the word 'privately' as used in the statute is intended, we think, to be synonymous with *confidential*. In other words, the communications referred to were intended to mean those of a secret nature between husband and wife." (166 Va. 511).

The specific question presented, incident to the admissibility of the questioned testimony, requires a determination of the scope of the meaning of the words "any communication privately made" as used in the present statute, and is of first impression in Virginia.

Numerous conflicting decisions of other States and the divergent views of eminent textwriters evidence the fact that there exists a marked division of authority upon the subject.

Certain cases turn upon or are influenced by the particular wording of the statutes of the respective States. Some of these statutes expressly extend the privilege to include acts, transactions and matters between husband and wife during coverture. The broad and inclusive terms and phraseology of the respective statutes involved appear from the following decisions: *Dischner* v. *Dischner*, 16 Ohio App. 86; *McCague* v. *Miller*, 36 Ohio St. 595; *Schreffler* v. *Chase*, 245 Ill. 395, 92 N. E. 272; *Monaghan* v. *Green*, 265 Ill. 233, 106 N. E. 792. Also see *Cavert* v. *State*, 158 Tenn. 531, 14 S. W. (2d) 735.

In States where the language of the statutes is quite similar to that of section 6212, or where no statute exists on the subject and the common law privilege still obtains, we find many well considered decisions adhering to the liberal or inclusive view insisted upon by accused.

In Kentucky the statute provides: "Neither a husband nor his wife shall testify while the marriage exists or afterwards concerning any communication between them during marriage * * * ." Civ. Code Prac., sec. 606.

In *Todd* v. *Barbee*, 271 Ky. 381, 111 S. W. (2d) 1041, the court in applying that statute said:

"The word 'communication', therefore, as used in our statute, should be given a liberal construction. It should not be confined to a mere statement by the husband to the wife or vice versa, but should be construed to embrace all knowledge upon the part of the one or the other obtained by reason of the marriage relation and which, but for the confidence growing out of it, would not have been known to the party."

To the same effect are *Willey* v. *Howell*, 168 Ky. 466, 182 S. W. 619, and *Prudential Ins. Co.* v. *Pierce*, 270 Ky. 216, 109 S. W. (2d) 616.

The Michigan statute provides, in part, that neither hus-

band nor wife, during or after the termination of the marriage, "shall be examined as to any communication made by or to the other during marriage."

Construing that statute, the court in *People* v. *Gessinger*, 238 Mich. 625, 214 N. W. 184, at p. 186, quoted at length and with approval from 9 R. C. L. 490, where it is stated:

"The communications to which neither husband nor wife can testify for or against the other during the marriage or after it has ceased should not be confined to mere statements by one to the other, but should embrace all knowledge upon the part of either obtained by reason of the marriage relation, and which, but for the confidence growing out of it, would not have been known."

Another case in point from that jurisdiction is *Pierson* v. *Illinois Cent. R. Co.*, 159 Mich. 110, 123 N. W. 576.

The common law disqualification of husband and wife as witness for or against each other generally having been removed in Indiana, the provision of the statute relative to communications between them during marriage reads: "Husband and wife as to communications made to each other during marriage shall not, in any case, be competent witnesses, unless with the consent of the party making such confidential communications." Indiana Acts, 1879, p. 245. In determining whether or not the ban of the statute applied to acts committed by one spouse in the presence of the other during coverture, the court said in *Perry* v. *Randall*, 83 Ind. 143, at p. 147:

"We are of the opinion, however, that the appellant's acts in relation to the appellee's lost money, done in the presence of the witness Henrietta, during the marriage and in response to her questions or suggestions, were 'confidential communications' to her by her husband, the appellant, within the meaning of the statute."

Applying the rule precluding the admissibility of communications between husband and wife as it exists at common law, the Mississippi court, in *Whitehead* v. *Kirk*, 104 Miss. 776, at pp. 812, 813, 61 So. 737, 62 So. 432, said:

"We think the major part of Mrs. Kirk's testimony comes

under the condemnation of the rule which prevents one spouse from testifying about the acts and words of the other, which acts or words were performed or uttered when they were alone and were therefore to be deemed confidential. .

\*       \*       \*       \*       \*       \*

"When husband and wife are alone, everything said and done is under the protection of the rule and the declarations and conduct of both are presumed to be confidential."

Adhering to the view that confidential communications between husband and wife extend beyond mere verbal or written statements is the well considered case of *Mercer* v. *State*, 40 Fla. 216, at p. 227, 24 So. 154, 74 Am. St. Rep. 135. There we find this inclusive statement:

"But the reason for the rule for excluding the *confidences* between husband and wife as *incompetent matter* to be deposed by either of them, though they may be competent *witnesses* to testify to other facts, is found to rest in that public policy that seeks to preserve inviolative the peace, good order and limitless confidence between the heads of the family circle so necessary to every well ordered civilized society. The *matter* that the law prohibits either the husband or wife from testifying to as witnesses includes *any information* obtained by either during the marriage *and by reason of its existence*. It should not be confined to mere statements by one to the other, but embraces all knowledge upon the part of either obtained *by reason of the marriage relation*, and which, but for the confidence growing out of it, would not have been known."

See the recent case of *People* v. *Daghita*, 299 N. Y. 630, 86 N. E. (2d) 172.

58 Am. Jur., "Witnesses", section 385; 70 C. J., "Witnesses", sec. 512, p. 382; Jones on Evidence, Vol. 5, 2nd Ed., sec. 2143; Vol. 3, Wharton on Criminal Evidence, 11th Ed., sec. 1250, and 2 Bishop Marriage, Divorce and Separation, sec. 1663, also approve the liberal construction contended for by accused.

Adhering to the more restricted interpretation which limits the admissibility of communications between husband

and wife, imparted during coverture, to spoken or written statements is found the eminent authority on evidence, Dean Wigmore. In his excellent work at sec. 2337, Vol. 8, Wigmore on Evidence, 3rd Ed., he thus expresses his views:

"Communications, not Acts.—The privilege has for its object the security from apprehension of disclosure,—a security in consequence of which confidences will be freely given and not withheld. The protection therefore extends only to *communications*, i. e., utterances, *not acts*,—the reasoning being analogous to that which establishes a similar limitation for communications between attorney and client.

\* \* \* \* \* \* \*

"To formulate a precise test would perhaps be impracticable. It is clear, however, that the mere doing of an act by the husband in the wife's presence is not a communication of it by him; for it is done for the sake of the doing, not for the sake of the disclosure. There must be something in the way of an invitation of the wife's presence or attention with the object of bringing the act directly to her knowledge. Except in such cases, the privilege cannot cover anything but an utterance of words, spoken or written."

Approving and supporting this limited interpretation of confidential communications are the following decisions: *In re Pusey's Estate*, 180 Cal. 368, 181 P. 648; *Mullin-Johnson Co.* v. *Penn Mut. Life Ins. Co.*, 2 F. Supp. 203; *Fraser* v. *United States*, 145 F. (2d) 139; *United States* v. *Mitchell*, 137 F. (2d) 1006; *Posner* v. *New York Life Ins. Co.*, 56 Ariz. 202, 106 P. (2d) 488; *State* v. *Dixson*, 80 Mont. 181, 260 P. 138, and *Howard* v. *State*, 103 Tex. Crim. 205, 280 S. W. 586. See also 19 Cal. L. Rev. 390.

Though a limited scope of the ban is approved and adopted by Dean Wigmore and applied in various jurisdictions, the decided weight of authority is in support of the more liberal and broader interpretation.

The weight of authority, and in our opinion, on principle, the better view, extends the privilege beyond mere utterances or written words. Inherent in the privilege is

the fundamental purpose to protect from public exposure confidences of the marital relation.

It is far better that occasional hardships be suffered and that crime sometimes go unpunished than to limit confidential communications between husband and wife to mere spoken or written words. That would render susceptible of and expose to public observation and knowledge all confidential conduct, transactions and acts not consisting of spoken or written words, which the continued tranquility, integrity and confidence of their intimate relation demands to be shielded and protected by the inviolate veil of the marital sanctuary. The purpose and security of the privilege would be partially and materially defeated and destroyed by any less inclusive interpretation of the language of the statute.

It is difficult to formulate any rule by which various matters transpiring between spouses may be readily catalogued and correctly classified as "communications privately made". Yet, in our opinion, the immunity and ban of the statute applies to and includes all information or knowledge privately imparted and made known by one spouse to the other by virtue of and in consequence of the marital relation through conduct, acts, signs, and spoken or written words.

The testimony objected to by accused should have been excluded and its admission constituted reversible error. The judgment of the trial court is reversed and a new trial awarded.

*Reversed and remanded.*